UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| DESHANTAL W., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:21-cv-624-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Deshantal W. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Act, and her application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 14).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 7, 8. Plaintiff also filed a reply brief. *See* ECF No. 9. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 7) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 8) is **GRANTED**.

## <u>BACKGROUND</u>

Plaintiff protectively filed an application for DIB on January 4, 2018, and an application for SSI on February 6, 2018. Transcript ("Tr.") 176-84, 178-84, In both applications, Plaintiff alleged disability beginning October 13, 2017 (the disability onset date), due to: (1) migraines; (2) neck pain; (3) back pain; (4) thyroid; (5) arthritis; (6) depression; (7) leg pain; (8) chest pain;

(9) stomach issues; and (10) pre cancer cells cervix." Tr. 176-84, 178-84, 208. The claims were denied initially on May 22, 2018, after which Plaintiff requested an administrative hearing. Tr. 12. On January 31, 2020, Administrative Law Judge Susan Smith ("the ALJ") conducted a video hearing from Falls Church, Virginia. Tr. 15. Plaintiff appeared and testified in Buffalo, New York. *Id*. Although informed of her right to representation, Plaintiff chose to appear and testify without the assistance of an attorney or other representative. *Id*. Megan Cameron., an impartial vocational expert, also appeared and testified. Tr. 30-54.

The ALJ issued an unfavorable decision on May 5, 2020, finding that Plaintiff was not disabled. Tr. 9-25. On April 5, 2021, the Appeals Council denied Plaintiff's request for further review. Tr. 1-6. The ALJ's May 5, 2020 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## **LEGAL STANDARD**

### I.    **District Court Review**

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.     The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the

3

Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in her May 5, 2020 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since October 13, 2017, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following medically determinable impairments: thyroid disease, migraines, degenerative disc disease, abdominal distention, gastrointestinal system disease, and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq*. and 416.921 *et seq*.).

5. Alternatively, the claimant has the following severe impairments: thyroid disease, migraines, degenerative disc disease, abdominal distention, gastrointestinal system disease, and depression (20 CFR 404.1520(c) and 416.920(c)).

6. Alternatively, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

7. Alternatively, the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

8. Alternatively, the claimant is capable of performing past relevant work as a salesperson (D.O.T. 270.357-034). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

9.   The claimant has not been under a disability, as defined in the Social Security Act, from October 13, 2017, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 12-25.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits protectively filed on January 4, 2018, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 25. The ALJ also determined that based on the application for supplemental security income protectively filed on February 6, 2018, the claimant is not disabled under section 1614(a)(3)(A) of the Act. *Id.*

## ANALYSIS

Plaintiff essentially asserts a single point of error. Although in the "Issues Presented" section of her brief, Plaintiff includes a second point entitled "The ALJ Impermissibly Relied on Her Lay Interpretation of Medical Evidence" (*see* ECF No. 7-1 at 1), Plaintiff's short (10 pages) brief lacks any argument related to this point. *See generally* ECF No. 7-1. However, Plaintiff's first point asserts multiple challenges to the ALJ's finding that Plaintiff did not have any non-exertional limitations. *See* ECF No. 7-1 at 6-10.

First, Plaintiff argues that the ALJ erred at step two by finding that all of Plaintiff's impairments were non-severe. *See id.* at 6. While Plaintiff acknowledged the ALJ's alternative finding that she did have severe physical and mental impairments, she contends that the RFC finding was deficient because it did not include any non-exertional limitations from her depression and migraines. *See id.* at 6-7, 9. Further, argues Plaintiff, the step two finding and the RFC finding were deficient because they were based on an incomplete record. *See id.* at 9. According to Plaintiff, she testified she was seeing "Dr. Obat" for her migraine headaches, yet there was no indication that the ALJ attempted to obtain records from Dr. Obat. *See id.* (citing Tr. 38-41).

In response, the Commissioner argues that the ALJ reasonably determined that Plaintiff did not have any non-exertional limitations resulting from her mental impairments because those impairments were not severe. *See* ECF No. 8-1 at 7-22. The Commissioner also argues that the ALJ adequately developed the record because the ALJ appropriately requested the treatment records of "Dr. Obat"[1] after the January 31, 2020 hearing, and incorporated those records into the administrative record. *See id*. at 22-25.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

In this case, the ALJ made an initial finding that Plaintiff's physical and mental impairments, considered singly and in combination, did not significantly limit her ability to perform basic work activities, and therefore, she did not have a severe impairment or combination of impairments. Tr. 15-21. However, the ALJ also made an alternative finding that, even if Plaintiff had severe impairments, she was not disabled because she retained the capacity to perform the full range of light work, and therefore, she could do either her past relevant work as a salesperson, or other work that exists in significant numbers in the national economy. Tr. 21-25. Upon review of the record, the Court finds that both the ALJ's initial and alternative findings were supported by

---

[1] At the hearing, Plaintiff identified her psychiatrist as "Dr. Obat" and indicated that he worked at the Butler Clinic. Tr. 38. After the hearing, the ALJ obtained additional records, including from the Butler Clinic, indicating that Plaintiff received treatment from psychiatric nurse practitioner Obot A. Obot ("Mr. Obot") in August 2018. Tr. 671-80 The Court is satisfied that Dr. Obat and Mr. Obot are the same person, as evidenced by Mr. Obot's August 3, 2018 progress note stating that Plaintiff was seeing neurologist Dr. Glover for her migraines (Tr. 671), which is consistent with Plaintiff's hearing testimony that she was seeing Dr. Glover for her migraines (Tr. 38).

substantial evidence, including the opinions of two consultative examiners, the prior administrative medical findings of two state agency consultants, Plaintiff's treatment notes showing largely benign findings and conservative treatment, and her wide range of daily activities. Accordingly, the Court finds no error in the Commissioner's final decision.

On January 17, 2017, primary care physician Frances Ilozue, M.D. ("Dr. Ilozue"), completed a medical examination for employability assessment. Tr.356-57. Dr. Ilozue indicated that she had been treating Plaintiff for 19 months (Tr. 357) and documented Plaintiff's conditions as migraines, epigastric pain, knee, back and arm pain, and depression (Tr. 356). Dr. Ilozue also indicated that Plaintiff had been referred to a gastroenterologist for her epigastric pain and was being followed by neurology for her headaches; pain management for her knee and back pain; and a psychiatrist for depression. Tr. 356. She opined that Plaintiff was moderately limited in walking, standing, and sitting; and very limited in lifting, carrying, pushing, and pulling. Tr. 357. In the mental categories of performance, Dr. Ilozue opined that Plaintiff had moderate mental limitations in understanding, remembering, and carrying out instructions, and in interacting appropriately with others. *Id*. Dr. Ilozue opined that Plaintiff's conditions were "chronic and seem to be getting worse." *Id*.

On November 9, 2017, Plaintiff saw neurologist Robert Glover, M.D. ("Dr. Glover"), for evaluation of reported migraines. Tr. 354-55. Plaintiff described her headaches as severe and debilitating and reported that depression and stress were the main triggers. Tr. 355. Examination showed photophobia and swaying with Rhomberg testing. *Id*. Plaintiff had a slow and deliberate gait, and straight leg raise testing was described as positive. *Id*. Dr. Glover also indicated that "there [was] likely a strong component of medication overuse headaches" and advised "restricting

use of Tylenol to just one or two times a week." *Id*. He started Plaintiff on Amitriptyline and ordered an MRI of the brain. *Id*.

At a follow-up visit on January 12, 2018, Plaintiff reported an initial limited response with Amitriptyline but stated that her headaches improved with an interim increase in dose, and she no longer had day-long incapacitation. Tr. 351. Plaintiff also reported significant depression and mood swings. *Id*. Dr. Glover opined that depression was exacerbating Plaintiff's symptoms and referred her for a psychiatric evaluation. Tr. 353. On March 2, 2018, Plaintiff reported that Amitriptyline was no longer effective, and the side effects were greater than the benefit. Tr. 348. She had not followed up with psychiatry, and her brain MRI was noted as normal. *Id*. Dr. Glover again noted that Plaintiff's refusal to see a mental health provider was exacerbating her headaches and indicated that the prospect of improvement without mental health treatment was limited. Tr. 350. Plaintiff "voiced understanding and agreed." *Id*.

On April 11, 2018, Plaintiff saw consulting psychiatric examiner Stephen Farmer, Psy.D. ("Dr. Farmer"). Tr. 381-85. Plaintiff reported difficulty sleeping, dysphoric moods, crying spells, irritability, fatigue, loss of energy, and difficulty concentrating. Tr. 381. She also reported essentially normal activities of daily living except that she had poor socialization and difficulty in family relationships due to her moods. Tr. 383. She also stated that she could not drive due to physical pain. *Id*. On mental status examination, Plaintiff had "somewhat" restricted affect and irritable and dysthymic mood, but the rest of the examination was otherwise normal. Tr. 382-83. Dr. Farmer diagnosed an "unspecified depressive disorder" and assessed none or only mild limitations in mental functioning and indicated that her symptoms did not appear to interfere with daily functioning, and she would have a good prognosis with six months of treatment. Tr. 384.

Plaintiff also was seen by consulting internal medicine examiner Samuel Balderman, M.D. ("Dr. Balderman"), on April 11, 2018. Tr. 386-91. Plaintiff reported migraines and frequent headaches, as well as spinal pain and gastrointestinal pain. Tr.386. She reported that her spine pain was intermittent, moderate in intensity, and not relieved by medication. *Id*. She also reported that she had a migraine every other day, up to 12 hours each, with only partial relief from medications. *Id*. Examination showed a tender and distended abdomen, squatting to only 50% of full, and lumbar flexion limited to 70 degrees. Tr. 387-88. Examination findings were otherwise normal, including normal gait and ambulation and negative straight leg raise testing. *See id*. Cervical spine x-ray imaging showed only some straightening, and lumbar x-ray was negative. Tr. 388, 390-91. Dr. Balderman diagnosed headaches and abdominal distention and opined that Plaintiff had mild limitations "sustaining physical activities such as carrying, climbing, and prolonged walking." Tr. 389.

On April 11, 2018, Plaintiff was evaluated for physical therapy at Glover Physical Therapy and Pain Rehabilitation and appears to have attended three sessions in April 2018. Tr. 395-407, 512-18. However, there is no record of any further physical therapy treatment with this provider after April 2018. *See i*d.

On April 23, 2018, state agency reviewing psychologist K. Lieber-Diaz, Ph.D. ("Dr. Lieber-Diaz"), reviewed the record evidence at the time and assessed that Plaintiff had no limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing herself. Tr. 84. Dr. Lieber-Diaz concluded that Plaintiff did not have a severe mental impairment because mild limitations or less are consistent with a non-severe impairment. Tr. 84-85.

On April 25, 2018, Plaintiff had a follow-up visit with Howard Lippes, M.D. ("Dr. Lippes"), after completing lab work about a month prior Tr. 409-10.  Plaintiff had been out of medication for at least one month. Tr. 409. Dr. Lippes noted poor medication compliance, significantly elevated TSH; an "inordinate" weight gain; and an extremely large firm Hashimoto's goiter, which he "expect[ed] . . . ha[d[ affected her recurrent laryngeal nerve." *Id*. Plaintiff admitted that she was not taking her replacement levothyroxine, and Dr. Lippes noted mild hypothyroidism on clinical examination, *Id*. He also noted that he had "previously referred [Plaintiff] for a definitive surgical evaluation, but she ha[d] not gone." *Id*. Dr. Lippes refilled Plaintiff's levothyroxine and provided another surgical referral. Tr. 410. There was no mention of headaches, spine pain, abdominal pain, or depression during this visit. *See id*.

On May 30, 2018, Plaintiff presented for an "evaluation of thyroid nodules." Tr. 753-56. She reported hoarseness that worsened daily and abdominal distention over the past five months, with a 50-pound weight gain. Tr. 753. She was still inconsistent with taking her thyroid medication. *Id*. Plaintiff also reported diffuse joint pain. *Id*. There was no mention of headaches. *See id*. Other than enlarged thyroid, her physical examination was largely normal. Tr. 755. Plaintiff was scheduled for a CT scan of the neck and repeat blood work. Tr. 756.

On August 3, 2018, Plaintiff saw Mr. Obot for a psychiatric evaluation. Tr. 671-80. The treatment note indicates that Plaintiff complained of migraines and had been referred by Dr. Glover for counseling due to depression. Tr. 671. Plaintiff reported difficulty sleeping, difficulty getting out of bed, and not wanting to be around people. *Id*. She also reported depressed moods, anger issues, and irritability. Tr. 672. However, mental status examination was unremarkable except for a sad mood. Tr. 673, 675-76. Mr. Obot diagnosed an adjustment disorder; prescribed trazadone;

and recommended cognitive behavioral therapy; he also assessed Plaintiff's prognosis as "good." Tr. 678.

On September 11, 2018, Plaintiff saw Jaffar Siddiqui, M.D. ("Dr. Siddiqui"), for a physiatry consultation. Tr. 656-58. Plaintiff reported neck, back, and regional pain but did not complain of uncontrolled migraines. Tr. 656. Plaintiff exhibited "poor" effort during the physical examination, but even so, there were no deficits in range of motion or strength. Tr. 657. There was some diffuse tenderness, but no other abnormalities. *Id*. Dr. Siddiqui ordered a lumbar MRI study and suggested that Plaintiff consult a pain management specialist. Tr. 656. Plaintiff reported she was doing land- and aquatic-based physical therapy, but she had stopped when she underwent a thyroidectomy. Tr. 657. Dr. Siddiqui also continued Plaintiff on physical therapy. Tr. 656.

On September 19, 2018, Plaintiff had a follow-up visit with Dr. Ilozue. Tr. 563-65. Plaintiff was status post her thyroidectomy and reported no acute complaints. Tr. 563. However, she reported continued headaches, for which she had been prescribed a new medication. *Id*. She reported she was following with Dr. Lippes for her thyroid; Dr. Peter Frederick for a vulvar lesion; and neurologist Dr. Glover for her migraines. *Id*. She also reported she had been referred to Dr. Gary Wang for pain management, but she "didn't like him" and had gotten an appointment with "Dr. Bansai [,] however [that appointment was] in 8 months." *Id*. No further clinical objective musculoskeletal, neurological, or psychiatric abnormalities were noted. *See* Tr. 563-65.

At a re-assessment with Dr. Siddiqui on October 17, 2018, Plaintiff's MRI had not been performed because her insurer found it to be unwarranted. Tr. 645. Dr. Siddiqui noted that Plaintiff had attended physical therapy twice weekly in June 2018 and once in September 2018. *Id*. Examination findings were unchanged. Tr. 646. Dr. Siddiqui again ordered imaging, in addition to suggesting a rheumatology evaluation and pain management consultation. *Id*.

At a January 23, 2019, follow-up visit with Dr. Siddiqui, Plaintiff noted headaches, but she associated them with neck pain instead of an independent migraine syndrome or triggered by depression. Tr. 619. Other than tenderness, her physical examination findings were again unremarkable. Tr. 619-20. Dr. Siddiqui noted that a January 11, 2019, MRI study of the lumbar spine showed facet arthropathy and only a "tiny" subchondral cyst at L4-5 and a "minimal" protrusion at L5-S1. Tr. 620. Otherwise, the disc space heights were well maintained, and the neural foramen and central canal were normal. *Id*. Dr. Siddiqui recommended lumbar facet injections and ordered an EMG to evaluate reported upper extremity symptoms; he also ordered an MRI of the cervical spine, noting that Plaintiff had "failed physical therapy and nonsteroidal anti-inflammatory regimen." *Id*.

On March 21, 2019, Plaintiff saw Dr. Siddiqui for another physiatry evaluation. Tr. 825-26. She reported radiating neck pain in addition to low back pain; she reported her pain as 10/10. Tr. 825. Dr. Siddiqui noted that Plaintiff was status post lumbar facet injections performed in February 2019, for which she reported minimal relief. *Id*. He also noted that a March 2019 cervical spine MRI that showed multi-level protrusions. Tr. 826. However, the musculoskeletal and neurological examinations were entirely normal, and there was no mention of depressive symptoms or abnormal mental status examination. Tr. 825-26. Plaintiff was offered trigger point injections and referral for physical therapy. Tr. 826.

On April 26, 2019, Plaintiff had a follow-up visit with primary care provider Dr. Ilozue. Tr. 575-77. She reported heartburn and epigastric pain, for which she was taking Omeprazole, but reported no acute complaints. Tr. 575 Plaintiff also reported that she was no longer taking Trazadone but had switched to Zolpidem. *Id*. She also reported no particular complaints related to neck, back, arm, leg, or migraine/headache pain. *Id*. She stated that she was no longer seeing her

previous pain management source because she disagreed with his treatment plan, but she planned to follow-up with other sources and physical therapy. *Id*. She also reported that she was still following Dr. Glover for headaches and taking Amitriptyline. *Id*., Although Plaintiff reported depression and stress, her psychiatric examination findings were unremarkable. Tr. 576. Musculoskeletal examination showed only some mild unspecified joint tenderness, and her abdomen was again noted to be "distended likely due to visceral obesity." *Id*.

A primary care follow-up visit on July 26, 2019 was essentially the same as the April 2019 visit, except that Plaintiff reported some fatigue and anxiety and some recent abdominal pain and cramping symptoms. Tr. 582. Mental status, musculoskeletal, and neurological examination remained unremarkable. Tr. 584. Dr. Ilozue indicated that Plaintiff's TSH level should be checked to determine if her thyroid medication dosage needed to be adjusted. Tr. 582.

On December 9. 2019, Plaintiff presented to the Emergency Department ("ED") with an acute onset of chest wall pain and left-sided neck pain. Tr. 789-93. She had no significant shortness of breath or arm weakness. Tr. 789. Chest x-ray was normal, and Plaintiff was diagnosed with a shoulder girdle muscle spasm. Tr. 792. She was treated with muscle relaxant and discharged. *Id*.

Shortly thereafter, on December 16, 2019, Plaintiff saw her primary care provider for routine follow-up. Tr. 586- 91. Plaintiff reported that she felt nauseous and generally did not feel well when taking her thyroid medication. Tr. 586. Plaintiff reported her recent ED visit and stated she had been diagnosed with a muscle spasm; however, she mentioned no particular complaints related to the symptoms that were the subject of her ED visit. *See id*. There was also no mention of unrelieved headaches or depressive symptoms and no complaint of a separate chronic spine and radicular pain or a current headache. *See id*. Musculoskeletal and neurological examination were again unremarkable. Tr. 587. Plaintiff appeared "healthy" and in no apparent distress; she had no

abdominal distention or bulge; she had normal posture and walked with a normal gait; strength and range of motion were intact; there was no spinal tenderness; and she had a normal memory and affect. *Id*. Plaintiff was advised to discuss her thyroid medication with her endocrinologist and follow-up with a GI specialist. Tr. 591.

A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional

capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ.).

Effective for claims filed on or after March 27, 2017, the Social Security Agency comprehensively revised its regulations governing medical opinion evidence creating a new regulatory framework. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15, 132-01 (March 27,

2017). Here, Plaintiff filed her claims on January 4, 2018, and February 6, 2018, and therefore, the 2017 regulations are applicable to her claims.

First, the new regulations change how ALJs consider medical opinions and prior administrative findings.  The new regulations no longer use the term "treating source" and no longer make medical opinions from treating sources eligible for controlling weight. Rather, the new regulations instruct that, for claims filed on or after March 27, 2017, an ALJ cannot "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a) (2017).

Second, instead of assigning weight to medical opinions, as was required under the prior regulations, under the new rubric, the ALJ considers the persuasiveness of a medical opinion (or a prior administrative medical finding). *Id*. The source of the opinion is not the most important factor in evaluating its persuasive value. 20 C.F.R. § 416.920c(b)(2). Rather, the most important factors are supportability and consistency.  *Id*.

Third, not only do the new regulations alter the definition of a medical opinion and the way medical opinions are considered, but they also alter the way the ALJ discusses them in the text of the decision. 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each factor. *Id*. Instead, when articulating his or her finding about whether an opinion is persuasive, the ALJ need only explain how he or she considered the "most important factors" of supportability and consistency. *Id*. Further, where a medical source provides multiple medical opinions, the ALJ need not address every medical opinion from the same source; rather, the ALJ need only provide a "single analysis." *Id*.

Fourth, the regulations governing claims filed on or after March 27, 2017 deem decisions by other governmental agencies and nongovernmental entities, disability examiner findings, and statements on issues reserved to the Commissioner (such as statements that a claimant is or is not disabled) as evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 416.920b(c)(1)-(3) (2017). The regulations also make clear that, for claims filed on or after March 27, 2017, "we will not provide any analysis about how we considered such evidence in our determination or decision" 20 C.F.R. § 416.920b(c).

Finally, Congress granted the Commissioner exceptionally broad rulemaking authority under the Act to promulgate rules and regulations "necessary or appropriate to carry out" the relevant statutory provisions and "to regulate and provide for the nature and extent of the proofs and evidence" required to establish the right to benefits under the Act. 42 U.S.C. § 405(a); *see also* 42 U.S.C. § 1383(d)(1) (making the provisions of 42 U.S.C. § 405(a) applicable to title XVI); 42 U.S.C. § 902(a)(5) ("The Commissioner may prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out the functions of the Administration."); *Barnhart v. Walton*, 535 U.S. 212. 217-25 (2002) (deferring to the Commissioner's "considerable authority" to interpret the Act); *Heckler v. Campbell*, 461 U.S. 458, 466 (1983). Judicial review of regulations promulgated pursuant to 42 U.S.C. § 405(a) is narrow and limited to determining whether they are arbitrary, capricious, or in excess of the Commissioner's authority. *Brown v. Yuckert*, 482 U.S. 137, 145 (1987) (citing *Heckler v. Campbell*, 461 U.S. at 466).

Plaintiff asserts multiple challenges to the ALJ's conclusion that Plaintiff did not have any non-exertional limitations, which the Court will address in turn. *See* ECF No. 7-1 at 6-10. Plaintiff first argues that the ALJ erroneously found her mental impairments non-severe at step two of the

sequential evaluation. *See* ECF No. 7-1 at 8-10. Further, argues Plaintiff, the ALJ improperly failed to account for her non-exertional impairments (even if non-severe) in the RFC by permitting her to perform the full range of light work. *See id*. However, contrary to Plaintiff's arguments, the ALJ reasonably determined that Plaintiff did not have any non-exertional limitations from her mental impairments because those impairments were not severe, and Plaintiff has not met her burden of proving otherwise.

At the second step of the sequential evaluation, an ALJ considers whether the claimant has at least one severe impairment or combination of impairments that meets the twelve-month durational requirement for establishing disability. *See* 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not "severe" if it does not significantly limit a claimant's physical or mental capacity to perform basic work activities, defined as the abilities and aptitudes to do most jobs. 20 C.F.R. § 416.922; SSR 85-28, 1985 WL 56856 (1985); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). If the claimant does not have any severe impairments, then the claimant is not disabled, and the sequential evaluation ends. *Id*. However, if the claimant has at least one severe impairment or combination of impairments, then the evaluation continues, and the ALJ considers all impairments and symptoms when evaluating RFC. *See* 20 C.F.R. § 404.1529, 404.1545(a)(2).

Furthermore, it is Plaintiff's burden to demonstrate that she has a severe impairment. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). The mere presence of an impairment, or that a person has been diagnosed and/or treated for an impairment is not, by itself, sufficient to render a condition severe. *Prince v. Astrue*, 514 F. App'x 18, 20 (2d Cir. 2013); *see Bergeron v. Astrue*, No. 09-CV-1219, 2011 WL 6255372, at *3 ((N.D.N.Y. Dec. 14, 2011) (quoting *McConnell v. Astrue*, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)) ("The 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated

for a disease or impairment' is not, itself, sufficient to deem a condition severe."); *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (step two is applied to screen out *de minimis* claims).. Instead, a claimant must demonstrate an impairment that "significantly limits [his] physical or mental ability to perform basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 25 (2003). Moreover, an impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

Plaintiff contends that "Dr. Ilozue and Dr. Lieber-Diaz opined that Plaintiff suffered from severe migraines," and "Dr. Ilozue and Dr. Farmer both opined that Plaintiff suffered from non-exertional limitations in the majority of categories of mental aptitudes." *See* ECF No. 7-1 at 8 (citing Tr. 100, 356, 357, 383-84). As noted above, however, the mere presence of a condition is insufficient. *Prince*, 514 F. App'x at 20. Plaintiff also contends that the ALJ was required to consider how these medical opinions overlap and failed to do so, which is "an error that merits remand in and of itself." *See id*. Contrary to Plaintiff's contentions, the ALJ clearly explained her findings regarding the persuasiveness of these opinions in terms of the "most important factors" of supportability and consistency. Tr. 16-18, 23.   *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

In the support of her finding that Plaintiff did not have a severe mental impairment, the ALJ reasonably relied on the findings and opinion of Dr. Farmer, who examined Plaintiff on April 11, 2018. Tr, 17, 381-85. Dr. Farmer assessed no limitations in understanding, remembering, and applying simple directions, and instructions; maintaining personal hygiene; and being aware of hazards; and a mild limitation in using judgment to make simple work-related decisions; interacting adequately with supervisors, coworkers, and the public; concentrating and performing tasks at a consistent pace; sustaining an ordinary routine; and regulating emotions, controlling behavior, and maintaining well-being. Tr. 383-84. Dr. Farmer concluded that the results of his

examination revealed psychiatric problems that did not appear to be significant enough to interfere with Plaintiff's ability to function on a daily basis. Tr. 384.

The ALJ explained that she was persuaded by Dr. Farmer's opinion because it was based on his largely normal examination findings, including cooperative demeanor, adequate manner of relating, well-groomed appearance, appropriate eye contact, coherent thought processes, clear sensorium, full orientation, intact concentration, intact memory, average cognitive functioning, and fair insight and judgment. Tr. 17, 383. *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (supportability).

The ALJ also noted that Dr. Farmer's findings were consistent with the largely normal findings of other practitioners. Tr. 18, 20, 675-76, 692). *See* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (consistency). For example, the ALJ highlighted the August 2018 findings of psychiatric nurse practitioner Mr. Obot.[2] Tr. 18, 675. Mr. Obot found that Plaintiff was cooperative, engaged, friendly, and pleasant. Tr. 675. Although Mr. Obot found that Plaintiff had a sad mood, she also had appropriate eye contact, normal speech, appropriate affect, unremarkable thought content, intact memory/cognition, intact attention, good impulse control, and good insight and judgment. Tr. 676. Notably, Mr. Obot assessed that Plaintiff's prognosis was "good," and her strengths included her communication skills and her resilience. Tr. 678.

The ALJ also noted the similarly benign mental status findings of other practitioners who were treating plaintiff primarily for physical complaints. *See* Tr. 20. Plaintiff routinely presented with normal mood and affect, normal speech, full orientation, pleasant and cooperative demeanor, and no acute distress. Tr. 683, 688, 692, 704-05, 730, 738-39, 766, 778, 781, 791, 805, 819, 823, 826, 833, 837, 845, 849. Plaintiff's treatment records also revealed that she repeatedly denied

---

[2] Although the ALJ inadvertently referred to Mr. Obot as Dr. Obot, the Court find this error is harmless. Tr. 18.

having psychiatric complaints, such as anxiety and depression. Tr. 719, 766, 772, 778, 800, 805, 837, 845. Plaintiff's normal objective findings and denial of psychiatric complaints provides support for the ALJ's finding that she did not have a severe mental impairment. *See Gaudette v. Colvin*, No. 5:14-CV-70, 2015 WL 6000258, at *7 (D. Vt. Oct. 14, 2015) (finding that the objective medical evidence provided support for the non-severity finding); *Clark v. Saul*, 444 F.Supp. 3d 607, 623 (S.D.N.Y. Mar. 13, 2020) (finding that plaintiff's lack of pain complaints supported the ALJ's non-severity finding).

The ALJ's finding that Plaintiff did not have a severe mental impairment is also supported by the prior administrative medical findings of state agency psychologist Dr. Lieber Diaz, who assessed no limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing herself. Tr. 84. Dr. Lieber-Diaz appropriately concluded that Plaintiff did not have a severe mental impairment because mild limitations or less are consistent with a non-severe impairment. Tr. 84-85. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

The ALJ's finding that Plaintiff did not have a severe mental impairment is also supported by Plaintiff's activities of daily living, which the ALJ noted were "essentially normal." Tr. 17. *See* 20 C.F.R. § 404.1529(c)(3)(i) (An ALJ may consider the nature of a claimant's daily activities in evaluating the consistency of allegations of disability with the record as a whole.); *see also Ewing v. Comm'r of Soc. Sec.*, No. 17-CV-68S, 2018 WL 6060484, at *5 (W.D.N.Y. Nov. 20, 2018) ("Indeed, the Commissioner's regulations expressly identify 'daily activities' as a factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms.") (citing 20 C.F.R. § 416.929(c)(3)(i)).

For example, the ALJ noted that the evidence in the record demonstrated that Plaintiff continued to work after she alleged becoming disabled, working up to 21 hours per week at Home Depot selling appliances. Tr. 17, 36, 195-97, 329, 840. She also worked briefly as a driver for a medical transportation company. Tr. 36. While the ALJ found that this work did not constitute substantial gainful activity (Tr. 14), she properly considered it when determining that Plaintiff did not have a severe mental impairment. Tr. 17. *See* 20 C.F.R. §§ 404.1571, 416.971 (explaining that even if the work a claimant had done was not substantial gainful activity, it may show that the claimant can do more work than he actually did); *Cabrero-Gonzalez v. Colvin*, No. 13-CV- 6184-FPG, 2014 WL 7359027, at *19 (W.D.N.Y. Dec. 23, 2014) (ALJ appropriately discredited claimant's allegations in part because he worked after his alleged disability onset date).

In addition to working, Plaintiff engaged in a wide range of other activities. She took care of her personal grooming needs, cooked, cleaned, did laundry, shopped, managed her money, and used public transportation Tr. 17, 383, 389. *See Poupore*, 566 F.3d at 307 (claimant's abilities to watch television, read, drive, and do household chores supported ALJ's finding that his testimony was not fully credible). The ALJ also noted that in April 2018, Plaintiff told Dr. Farmer that she could not drive due to pain (Tr. 383), but she reported in March 2019 that she was the driver in an automobile accident (Tr. 840). Tr. 17. *See Clark*, 444 F.Supp. 3d at 623 (evidence that plaintiff could go out alone, drive, do some chores, socialize, attend a course, read, and watch television supported a finding that her impairments were not severe).

In finding that Plaintiff did not have a severe mental impairment, the ALJ acknowledged that Plaintiff's primary care physician, Dr. Ilozue, assessed greater limitations. Tr. 21, 357. On January 17, 2018, Dr. Ilozue opined that Plaintiff had, at most, moderate mental limitations, including in understanding, remembering, and carrying out instructions, and in interacting

appropriately with others. Tr. 357. The ALJ explained that she did not credit Dr. Ilozue's opinion because it "was made in the absence of any psychiatric evaluation in the record at the time." Tr. 21. Notably, Plaintiff's examination by Mr. Obot in August 2018 (several months after Dr. Ilozue's opinion) was Plaintiff's first examination with a mental health professional and revealed normal findings. Tr. 18, 675-76. Likewise, another provider's examination from July 13, 2018, revealed that Plaintiff had a "normal mental status" (Tr. 692), and Dr. Ilozue's own findings from October 2018 revealed that plaintiff had a cooperative and appropriate attitude, a normal affect, normal memory, normal orientation (Tr. 553).

As previously noted, Dr. Farmer's findings and those of other practitioners were similarly benign. Tr. 382-83, 683, 688, 692, 704-05, 730, 738-39, 766, 778, 781, 791, 805, 819, 823, 826, 833, 837, 845, 849. Because Dr. Ilozue's opinion was less consistent with, and less supported by, the evidence in the record, the ALJ reasonably found it less persuasive and Dr. Farmer's opinion more persuasive when concluding that Plaintiff did not have a severe mental impairment. Genuine conflicts in the medical evidence, such as the ones present here, are for the Commissioner to resolve. *Veino*, 312 F.3d at 588.

Furthermore, in her alternative finding, the ALJ gave greater deference to Dr. Ilozue's opinion that Plaintiff had more than mild mental limitations (Tr. 357) but nevertheless determined at step five that Plaintiff could do the full range of light work. Tr. 23, 24. Thus, even assuming *arguendo* that the ALJ erred in determining that Plaintiff did not have a severe mental impairment, the error is harmless because the ALJ made an alternative finding where she considered Plaintiff's mental impairment beyond step two. Tr. 23. *See Reices-Colon v. Astrue*, 523 F. App'x. 796, 798 (2d Cir. 2013) (finding that, because the claimant's anxiety and panic disorders were considered during the subsequent steps, any error the ALJ committed at step two was harmless).

In addition, Dr. Ilozue assessed that Plaintiff had at most moderate mental limitations, as discussed above. Tr. 357. Contrary to Plaintiff's argument, the ability to perform unskilled work, such as the ALJ found here, is consistent with even moderate limitations. *See McIntyre v. Colvin*, 758 F.3d 146, 150-51 (2d Cir. 2014), 758 F.3d (finding that moderate limitation in maintaining concentration, persistence, or pace or in relating with others did not preclude unskilled work); *Snyder v. Saul*, 840 F. App'x 641, 643 (2d Cir. 2021) (finding ALJ's RFC corresponded with opinions suggesting Snyder suffered, at most, moderate limitations in mental work-related functioning); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (affirming a finding of unskilled work where the evidence showed moderate or less severe limitations in plaintiff's work-related functioning); *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (moderate limitations in different work-related areas were reasonably found to not preclude unskilled work); *Mayer v. Comm'r of Soc. Sec.*, No. 18-CV-0062, 2019 WL 2266795, at *5 (W.D.N.Y. May 28, 2019) ("The Second Circuit has repeatedly held that 'moderate' limitations do not preclude a plaintiff's ability to perform unskilled work.") (collecting cases).

Thus, the ALJ's finding that Plaintiff retained the ability to do unskilled work is not only consistent with the opinion of Dr. Ilozue, but it is also supported by the less restrictive opinions of Dr. Farmer and Dr. Lieber-Diaz, who assessed at most mild limitations. Furthermore, the ALJ's finding is supported by Plaintiff's treatment notes, showing mostly normal mental status findings; and by her activities of daily living, which included working part-time at Home Depot and performing household chores. Accordingly, the ALJ's alternative finding that Plaintiff did not have mental limitations that precluded her from doing unskilled work was supported by substantial evidence.

Likewise, the ALJ reasonably determined that Plaintiff did not have additional non-exertional limitations related to her migraines. Even assuming that her migraines were severe, Plaintiff has failed to show that they imposed additional limitations beyond those found by the ALJ, as was her burden. *Smith v. Berryhill*, 740 Fed. Appx. 721, 726 (2d Cir. 2018) (explaining that plaintiff had a duty to prove a more restrictive RFC than the ALJ found); *Parker v. Berryhill*, No. 17-cv-252-FPG, 2018 WL 4111191, at *4 (W.D.N.Y. Aug. 29, 2018) (same); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC.").

As an initial matter, Plaintiff's brief is bereft of any meaningful argument that the ALJ failed to account for Plaintiff's non-exertional impairments due to migraines. Other than casually asserting that "Dr. Lieber-Diaz opined that Plaintiff suffered from severe migraines," Plaintiff does not bother to explain what limitations the ALJ should have attributed to her migraines. *See* ECF No. 7-1 at 7-8. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Lynette W. v. Comm'r of Soc. Sec.*, No. 19-CV-1168-FPG, 2021 WL 868625, at *4 (W.D.N.Y. Mar. 9, 2021) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *Schoolcraft v. City of New York*, No. 10 CIV. 6005 RWS, 2014 WL 3952905, at *5 (S.D.N.Y. Aug. 12, 2014) (rejecting arguments that are only "cursorily raised" with "no further analysis").

Contrary to Plaintiff's suggestion that her migraines resulted in mental limitations that precluded unskilled work, the Court has already concluded that the ALJ's finding that Plaintiff could still do unskilled work was supported by the assessments of Drs. Farmer, Lieber-Diaz, and. Ilozue, as well as by Plaintiff's treatment notes, showing mostly normal mental status findings, and her activities of daily living, as discussed above.

Additionally, the ALJ thoroughly assessed the medical evidence regarding Plaintiff's physical limitations and reasonably found that Plaintiff could do the full range of light work. In so finding, the ALJ relied in part on Dr. Balderman's April 2018 opinion. Tr. 17, 389. Dr. Balderman diagnosed headaches and was, thus, aware of Plaintiff's complaints of migraine headaches. Tr. 389. Yet, Dr. Balderman opined that Plaintiff had only mild limitations in carrying, climbing, and prolonged walking and assessed no other exertional or non-exertional limitations. Tr. 389. Accordingly, Dr. Balderman's opinion of up-to-mild functional limitations supports a finding of light work. *Lewis v. Colvin*, 548 F. App'x 675, 677-78 (2d Cir. December 17, 2013) (finding that RFC assessment for a significant range of light work was supported by an assessment from a consultative examiner's that the claimant had mild limitations in prolonged sitting, standing, and walking, and should avoid heavy lifting and carrying); *Randy L.B. v. Comm'r of Soc. Sec.*, 18-CV-0358, 2019 WL 2210596, at *7 (N.D.N.Y. May 22, 2019) (Suddaby, C.J.) (noting that "there is voluminous legal authority . . . that supports the ALJ's finding of light work based in part on the mild to moderate limitations opined by [consultative examiner] Dr. Jenouri").

Although the ALJ found at step two that "Dr. Balderman's opinion for even mild limitations was inconsistent with the remainder of the record" and "not persuasive insofar as it suggests durational severity," the ALJ also considered the opinion in her alternative findings, giving it "more deference than that which is supported by the record." Tr. 17, 23, 387-88. Dr. Balderman noted that Plaintiff did not appear to be in acute distress; she had a normal gait, station, and ability to walk on her heels and toes; and she had no neurological deficits, such as deficits in sensory or motor function, related to her headaches or any other impairment. Tr. 387-88. Thus, Dr. Balderman's opinion was supported by his examination findings. Tr. 17, 23, 387-88. *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (supportability).

As the ALJ explained, "[e]ven with giving [Plaintiff] a large degree of benefit of the doubt, the record shows mostly normal clinical examinations except for abnormalities associated with the abdominal distention and thyroid mass, for which related exertional and non-exertional limitations are not apparent." Tr, 23. The ALJ noted that the record showed largely normal clinical examinations even in the absence of significant or sustained treatment (Tr. 350, 353, 548, 550, 553, 558, 561, 567, 574, 576, 587, 620, 657, 791); mild findings on diagnostic imaging, including an MRI of the brain that was reportedly normal (Tr. 348); Plaintiff's "extremely limited" follow-up or compliance with conservative treatment; and no evidence of emergency room visits for her headaches, which suggests that her headaches were adequately managed. Tr. 22-23. Plaintiff's history of conservative treatment also provided additional support for Dr. Balderman's opinion. Tr. 17, 23. *See Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014) (conservative treatment weighed against a finding of disability).

As discussed above, the ALJ also found that Plaintiff activities of daily living were essentially normal, which provided additional support for an RFC of light work. Tr. 17. *See Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (holding that the ALJ properly considered the claimant's reported daily activities in support of an RFC finding for light work); *Poupore*, 566 F.3d at 307. Based on the foregoing, the ALJ reasonably found that Dr. Balderman's opinion of mild limitations was consistent with the other evidence in the record. Tr. 23. *See* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (consistency).

The ALJ also gave some deference to the January 2018 opinion of Dr. Ilozue, who opined that Plaintiff was moderately limited in lifting/carrying and pushing/pulling limited in walking, standing, and sitting; and very limited in lifting, carrying, pushing, and pulling. Tr. 23, 357. As an initial matter, the limitations assessed by Dr. Ilozue are consistent with an ability to do light work.

*See, e.g.*, *April B. v. Saul*, 18-CV-0682, 2019 WL 4736243, at *5 (N.D.N.Y. Sept. 27, 2019) (Stewart, M.J.) ("Indeed, moderate limitations in standing and walking [and lifting] are consistent with light work.") (collecting cases); *Harrington v. Colvin*, 14-CV-6044P, 2015 WL 790756 at 15 (W.D.N.Y. Feb. 25, 2015) (moderate limitation in sitting, standing, and walking not inconsistent with RFC that claimant could sit, stand, and walk for six hours a day respectively and supports a finding of light or medium work); *Moxham v. Comm'r of Soc. Sec.*, No. 3:16-CV-1170 (DJS), 2018 WL 1175210, at *8 (N.D.N.Y. Mar. 5, 2018) (finding marked limitations in squatting, lifting, and carrying is not inconsistent with light work); *Figgins v. Berryhill*, 15-cv-6748, 2017 WL 1184341, *8 (W.D.N.Y. March 29, 2017) (affirming RFC for light work, which was based, in part, on consultative examiner's opinion that plaintiff would have moderate-to-severe limitations in standing, walking, squatting, bending, and lifting.).

Plaintiff does not argue that the ALJ should have adopted Dr. Ilozue's opinion regarding her exertional abilities; instead, she argues that the ALJ should have adopted Dr. Ilozue's opinion regarding plaintiff's non-exertional limitations "in the mental categories." *See* ECF No. 7-1 at 8 (citing Tr. 357). However, as discussed above, the moderate mental limitations assessed by Dr. Ilozue are not inconsistent with unskilled work. Thus, even if Plaintiff had moderate limitations in understanding or relating with others due to her headaches, those moderate limitations do not preclude unskilled work. As discussed throughout this opinion, the ALJ reasonably determined that Plaintiff could do the full range of light work and had no non-exertional limitations related to her headaches, and the ALJ's determination was supported by substantial evidence. Dr. Ilouze's opinion does not undermine this finding. Accordingly, the Court finds no error.

Finally, Plaintiff argues that the ALJ failed to develop the record because she did not request the treatment records of "Dr. Obat." Plaintiff's argument is meritless. An ALJ's duty to

develop the record is "generally affirmative," arising from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination. *See Perez v. Chater*, 77 F.3d. 41, 47 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d), (e)12) (other citation omitted); *see also Pratts v. Chater*, 94 F.3d 34, 47 (2d Cir. 1996) (same). Therefore, the Commissioner's regulations require the agency and/or the ALJ, to develop Plaintiff's "complete medical history," or "the records of his medical [or treating] source(s)," by making "every reasonable effort to help [Plaintiff] get medical evidence from" such treating sources. 20 C.F.R. § 404.1512(b)(1)(i)-(ii)). However, the ALJ's duty to develop the record is not limitless. "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information . . . ." *Rosa*, 168 F.3d at 79 n.5 (2d Cir. 1999) (internal quotation marks and citation omitted).

As noted above, Plaintiff testified at the hearing that her psychiatrist was "Dr. Obat" and indicated that he worked at the Butler Clinic. Tr. 38. After the hearing, the ALJ obtained additional records from the Butler Clinic, which included treatment records from nurse practitioner Mr. Obot (Tr. 671-80), who, as previously noted, the record establishes is the same practitioner as "Dr. Obat." Thereafter, on April 6, 2020, the ALJ sent Plaintiff a letter proffering the additional evidence to her (including the records from the Butler Clinic and Mr. Obot), explaining that she could question those records, submit additional ones, or request a supplemental hearing. Tr. 287. There is no evidence that Plaintiff did any of those things. Thus, Plaintiff's assertion that "there is no indication that the ALJ made any effort whatsoever to assist Plaintiff in procuring what could have been critical records" is completely inaccurate. *See* ECF No. 7-1 at 9.

Furthermore, contrary to Plaintiff's argument, the record indicates that the ALJ considered Mr. Obot's records, noting that Mr. Obot's August 3, 2019, progress note revealed largely normal

mental status findings, including good concentration, normal attention span, and a friendly demeanor. Tr. 18, 675-76. Plaintiff denied having any neurological symptoms (Tr. 674), and while Plaintiff complained of pain, Mr. Obot noted that the pain was not "[o]bservable" (Tr. 675). The ALJ also noted that Mr. Obot prescribed Trazadone for depression, recommended cognitive behavioral therapy, and assessed Plaintiff's prognosis as "good." Tr. 18, 678. As the ALJ noted, however, there was "no record of the claimant pursuing therapy." Tr. 18, 678. Additional records from Mr. Obot in July 2019 indicate that he ordered a blood test to evaluate plaintiff's Vitamin D levels (Tr. 810-11) and in September 2019, prescribed Sumatriptan for headaches (Tr. 477). The ALJ observed that in September 2019, Plaintiff reported to Dr. Ilozue that she had stopped taking Trazadone and had been prescribed Sumatriptan for headaches. Tr. 18, 20, 573. Notably, the September 2019 medication summary from Mr. Obot indicated that Sumatriptan was prescribed with 12 refills, suggesting that Mr. Obot was not seeing Plaintiff very frequently for her headaches. *See* Tr. 477. Accordingly, the records from Mr. Obot do not show that Plaintiff had any additional limitations from either her headaches or depression.

Because the ALJ requested and incorporated the additional evidence into the administrative record (including the treatment notes from Mr. Obot), she had sufficient evidence upon which to base her decision, and therefore, had no further obligation to develop the record. "The ALJ is not required to develop the record any further when the evidence already presented is adequate for [the ALJ] to make a determination as to disability." *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)) (internal citations omitted); *Lowry v. Astrue*, 474 Fed. Appx. 801, 804 (2d Cir. 2012) ("where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a claim for benefits")

(quoting *Rosa*, 168 F.3d at 79 n.5).  The ALJ had all the treatment records that were provided by Plaintiff's practitioners; she had the examination reports of two consultative examiners; she had the prior administrative medical findings of two state agency physicians; and she had Plaintiff's statements in questionnaires and at the hearing about her symptoms, limitations, and daily activities. Because the ALJ was able to decide based upon the evidence available, nothing more was required of her.

For all the reasons discussed above, the Court finds that the ALJ properly considered the evidence of record, including the treatment history, mental status examination findings, and Plaintiff's wide range of activities, and the ALJ's findings are supported by substantial evidence. Accordingly, the Court finds no error. When "there is substantial evidence to support either position, the determination is one to be made by the fact-finder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)).

The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault*, 683 F.3d at 448 (emphasis in the original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

## <u>CONCLUSION</u>

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 7) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 8) is **GRANTED**. Plaintiff's

Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter

judgment and close this case.

      **IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE